# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JOHN B.,
      Plaintiff,

    v.

KILOLO KIJAKAZI, ACTING
COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.

No. 3:22-cv-523 (SRU)

## <u>MEMORANDUM OF DECISION</u>

Plaintiff John B.[1] commenced this action pursuant to 42 U.S.C. § 405(g) to appeal the

decision of the Commissioner of the Social Security Administration (the "Commissioner")

denying the plaintiff's claim for disability insurance benefits under Title II of the Social Security

Act ("SSA"). John B. has moved for an order reversing the decision of the Commissioner or, in

the alternative, an order remanding this matter for another hearing. *See* Pl.'s Mot. to Reverse,

Doc. No. 14. The Commissioner has cross-moved for an order affirming the decision. *See* Def.'s

Mot. to Affirm, Doc. No. 16. After carefully considering the parties' submissions and reviewing

the administrative record, I **deny** the plaintiff's motion, doc. no. 14, and **grant** the

Commissioner's motion, doc. no. 16, because I conclude that the ALJ committed no reversible

legal error and that her decisions were supported by substantial evidence.

## I.    Standard of Review

The SSA follows a five-step process to evaluate disability claims. *See Selian v. Astrue*,

708 F.3d 409, 417 (2d Cir. 2013). First, the Commissioner determines whether the claimant

---

[1] The plaintiff will be identified solely by first name and last initial, as "John B.," or as "Plaintiff" throughout this opinion, in accordance with this Court's standing order. *See* Standing Order Re: Social Security Cases, No. CTAO-21-01 (D. Conn. Jan. 8, 2021).

currently engages in "substantial gainful activity." *Greek v. Colvin*, 802 F.3d 370, 373 n.2 (2d Cir. 2015) (citing 20 C.F.R. § 404.1520(b)). Second, if the claimant is not working, the Commissioner determines whether the claimant has a "'severe' impairment," *i.e.*, a physical or mental impairment that limits his or her ability to do work-related activities. *Id.* (citing 20 C.F.R. §§ 404.1520(c), 404.1521). Third, if the claimant does have a severe impairment, the Commissioner determines whether the impairment is considered "*per se* disabling" under SSA regulations. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). If the impairment is not *per se* disabling, then, before proceeding to step four, the Commissioner determines the claimant's "residual functional capacity" ("RFC") based on "all the relevant medical and other evidence of record." *Id.* (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)). A claimant's RFC is "what the claimant can still do despite the limitations imposed by his impairment." *Id.* Fourth, the Commissioner decides whether the claimant's RFC allows him to return to "past relevant work." *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)). Fifth, if the claimant cannot perform past relevant work, the Commissioner determines, based on the claimant's RFC, whether the claimant can do "other work existing in significant numbers in the national economy." *Id.* (citing 20 C.F.R. §§ 404.1520(g), 404.1560(b)). The process is sequential, meaning that a claimant is disabled only if he passes all five steps. *See id.*

"The claimant bears the ultimate burden of proving that he was disabled throughout the period for which benefits are sought," as well as the burden of proof in the first four steps of the five-step inquiry. *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418. If the claimant passes the first four steps, however, there is a "limited burden shift to the Commissioner at step five." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). At step five, the

Commissioner need show only that "there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's" RFC.  *Id.*

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the administrative record but do not decide *de novo* whether a claimant is disabled.  *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012); *see also Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.").  I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole."  *Greek*, 802 F.3d at 374–75.  The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla."  *Brault*, 683 F.3d at 447–48.  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Greek*, 802 F.3d at 375 (cleaned up).  Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld."  *Selian*, 708 F.3d at 417.

## II.    Factual and Procedural Background

### A.  Procedural Background

John B. filed an application for Title II benefits on August 9, 2019.  SSA Administrative Record (hereinafter "R."), at 71.[2]  He claimed that he could not work because of the following illnesses, injuries, or conditions: sleep apnea, depression, anxiety, bipolar disorder, suicidal thoughts, rosacea, and obsessive-compulsive disorder ("OCD").  R. at 71-72, 106.  He asserted a

---

[2] The facts in this section are taken from transcripts provided by the Acting Commissioner.  The Social Security Administration's Certified Administrative Record is filed in four parts at documents number 8, 8-1, 8-2, and 8-3.  Pin cites refer to the transcript page number, not the docket-stamped page numbers.

disability onset date of February 1, 2018, when he was 38 years old.  R. at 25, 72, 174.  The SSA

initially denied his application on October 24, 2019, and the agency denied it again upon

reconsideration on January 13, 2020.  *See* R. at 82, 106, 118.  At that point, John B. requested a

hearing before an administrative law judge.  R. at 135.  Administrative Law Judge Deirdre R.

Horton (the "ALJ") held an administrative hearing on October 14, 2020.  R. at 34-70.  John B.

appeared at the hearing with counsel and testified.  A vocational expert, Kenneth Smith, also

testified.  Thereafter, on December 18, 2020, the ALJ issued an unfavorable decision, concluding

that the plaintiff was not disabled within the meaning of the SSA and denying his claim.  R. at

11-33.  John B. appealed the decision to the Appeals Council, R. at 9-10, which denied his

request for review of the ALJ's decision and thereby rendered the ALJ's decision the final

decision of the Commissioner, R. at 1-8.

John B. filed this action on April 8, 2022.  Doc. No. 1.  The Commissioner answered the

complaint by filing the administrative record on June 5, 2022.  Doc. No. 8.  On September 5,

2022, the plaintiff moved for an order reversing or remanding the Commissioner's decision.  Doc.

No. 14.  On September 15, 2022, the Commissioner moved for an order affirming that decision,

arguing that substantial evidence supports the ALJ's decision.  Doc. No. 16.  The plaintiff did not

file further briefing.

B.  The Medical Evidence

1.  *Medical Notes*

I have reviewed the lengthy record in this case and assume the parties' familiarity with it.

I adopt the undisputed facts stated by the plaintiff in his Statement of Material Facts.  *See* Pl.'s

Medical Chronology ("Pl.'s Material Facts"), Doc. No. 14-2; Def.'s Response to Pl.'s Statement

of Facts ("Def.'s Resp. to Material Facts"), Doc. No. 16-2.  I cite only to the portions of the record necessary to explain my decision.

### 2.  *Medical Opinions*

The record contains reports from state agency medical consultants as well as a medical opinion from one of John B.'s treating mental health providers.

### a.  **Dr. Wyatt Beazley, III**

On October 22, 2019, state agency reviewer Dr. Wyatt Beazley, III conducted an initial state agency assessment, for which he reviewed initial evidence from the plaintiff, Franklin Street Community Health Center, and Optimus.  *See* R. at 77-79.  Dr. Beazley opined that John B.'s only severe impairment was emphysema.  R. at 76.  He further determined that John B. could occasionally lift and carry up to fifty pounds and could frequently lift and carry up to twenty-five pounds; that John B. could stand and/or walk six hours per eight-hour day and could sit six hours per eight-hour day; that John B. was unlimited in his ability to climb ramps and stairs and balance; that John B. could never climb ladders, ropes, and scaffolds; and that John B. could occasionally stoop, kneel, crouch, and crawl.  R. at 77-78.  Dr. Beazley stated that John B. demonstrated the capacity for light exertion; however, based on the foregoing, Dr. Beazley appears to have determined that John B. demonstrated the capacity for medium exertion.[3]  R. at 80.

---

[3] *See* 20 C.F.R. § 404.1567(c) (providing that medium work requires lifting no more than fifty pounds at a time with frequent lifting or carrying of objects weighing up to twenty-five pounds); SSR 83-10, 1983 WL 31251, at *6 (1983) (stating that medium work generally requires standing or walking, off and on, for six hours and sitting intermittently during the remaining time of an eight-hour workday).

### b. Dr. Thomas Hill

On December 23, 2019, state agency reviewer Dr. Thomas Hill opined that John B. was moderately limited in the ability to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, complete a normal workday and work week without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, and set a goal or make plans independently of others.  R. at 93-94.  Dr. Hill noted that when John B. abstains from alcohol and that he "can remember and carry out simple instructions, keep [appointments] maintain [attention and concentration] for at least 2 [hours]."  R. at 94.  However, "[a]nxiety [symptoms] occasionally distract [the plaintiff] and occasionally limit carrying out detailed instructions and working consistently."  R. at 94.  Dr. Hill further noted that the plaintiff "can become anxious in certain settings but can function and relate with work staff."  R. at 94.

### c. Dr. Marcia Foster

On January 12, 2020, state agency reviewer Dr. Marcia Foster conducted a reconsideration assessment, for which she reviewed the initial records as well as reconsideration evidence from Day Street Community Health Center, the plaintiff, and Laurel House.  *See* R. at 84-85.  Dr. Foster opined that John B.'s severe impairments included emphysema, disorders of back-discogenic and degenerative, and anxiety.  R. at 89.  Dr. Foster likewise determined that John B. could occasionally lift and carry up to fifty pounds and could frequently lift and carry up to twenty-five pounds.  Dr. Foster similarly determined that John B. could stand and/or walk six hours per eight-hour day and could sit six hours per eight-hour day.  R. at 91.  Further, Dr. Foster assessed that John B. was unlimited in his ability to climb ramps and stairs and balance; that John

6

B. could never climb ladders, ropes, and scaffolds; and that John B. could occasionally stoop, kneel, crouch, and crawl.  R. at 91-92.  Dr. Foster opined that John B. was eligible to work at a light exertion level.  R. at 96.

### d.  Dr. Chelsea McIntosh

Dr. Chelsea McIntosh, John B.'s psychologist, contributed two opinions.  R. at 457-62.

In the first, dated October 1, 2019, McIntosh noted that John B. had been seen biweekly between October 11, 2018 and October 1, 2019 for adjustment disorder with mixed anxiety and depressed mood and alcohol use disorder in sustained remission.  R. at 458.  She noted that John B. has average or better ability in all areas of functioning, except she additionally noted that he has difficulty managing anger and his wife has to help him dress due to back pain.  R. at 459-60.

In the second, dated December 2, 2019, McIntosh opined that John B. has been seen biweekly for individual therapy and group therapy beginning on October 11, 2018 through November 26, 2019 for adjustment disorder with mixed anxiety and depressed mood as well as alcohol use disorder in sustained remission.  R. at 2655-59.  She further noted that he had a visiting nurse and was compliant with his medication, that he is oriented but had difficulty focusing when stressed, and that he endorses hearing voices when under stress.  R. at 2655-56.  In her view, John B. had a "frequently a problem, or limited ability" using appropriate coping skills, and handling frustration appropriately.  R. at 2657.  He had a "sometimes a problem or reduced ability" to carry out multi-step and single-step tasks, focus long enough to finish simple activities or tasks, change from one simple task to another, perform basic activities at a reasonable pace, and persist in simple activities without interruption from psychological symptoms.  R. at 2658.

C.  <u>The ALJ Hearing</u>

Due to the coronavirus pandemic, the hearing before the ALJ was held remotely.  R. at
36-37.  Present at the hearing was John B. and his attorney, Olia M. Yelner.  R. at 36-37.
Impartial vocational expert Kenneth Smith and an interpreter for John B. were also present.  R. at
36-37.  All participants attended the hearing by telephone.  R. at 36.  The ALJ was tasked with
determining whether John B. was disabled beginning February 1, 2018.

At the time of his hearing, John B. was forty years old and living with his wife and
twenty-one-year-old son in Stamford, Connecticut.  R. at 40.  He testified that he cooks for
himself and his wife, but he eventually has to be seated while cooking.  R. at 49.

John B. has limited education.  He previously worked as a taxicab dispatcher, a home
attendant and a products assembler/packager.  R. at 54-57.  He testified that he has not worked
since 2018.  R. at 57.

John B. testified that he suffers from back pain in the middle of his lower back that, on an
average day, measures a six out of ten.  R. at 44.  He explained that sitting made his back pain
feel worse.  R. at 44-46.  If he sat for one hour, then he would need to walk around for ten to
fifteen minutes and take medication to control the pain.  R. at 44-46.  He could walk for ten
minutes before sitting, then he must sit for fifteen to twenty minutes.  R. at 50.  John B. also
testified that he "sometimes" used a cane, originally prescribed after a 2013 knee surgery, to
ambulate.  R. at 42-43, 51.  John B. testified that his chiropractor, Dr. David Gutierrez, had
recommended that he use the cane.  R. at 51.  He further testified that he can stand in one place
for no more than a half hour, after which he needs to sit down.  R. at 50.  By the afternoon, John
B. further testified, he can no longer sit and must instead lay down.  R. at 49.  If he could not lie
down, he testified, his pain would be "very, very strong."  R. at 52.

John B. testified that he would have difficulty attending work.  For one, his pain makes tasks take much longer to complete and he has difficulty focusing and concentrating, which is "completely different" than it was before the pain.  R. at 52.  He testified that he thought that he would need to excuse himself from work two to three times per week.  R. at 54.

The ALJ asked John B. about his work history.  Until 2013 or 2014, he was an independent contractor working as a dispatcher for USA Taxi until the owner "took [his] position" and reduced his hours.  R. at 54-55.  After that, he worked in homecare.  *Id.* at 55.  He further testified that he was terminated from his temporary employment at Hamilton Connections on an assembly line, assembling and packaging vacuums, because he "had to call out all the time" due to back pain from having to stand for "too many hours."  R. at 55-56, 60.  Eventually, the ALJ cut off discussion regarding John B.'s work history, indicating that further clarification was needed from the plaintiff's counsel.  R. at 58.

The vocational expert ("VE"), after answering a few clarifying questions, testified that John B.'s past work as a taxi dispatcher corresponded to a taxi cab starter, an unskilled, SVP level 3, sedentary exertional level and was performed as sedentary by the plaintiff.  R. at 60-61.  In addition, the VE testified that John B's past work in homecare corresponded to a home attendant, an unskilled, SVP level 3, medium exertional level, but performed at the heavy or even very heavy level by the plaintiff.  R. at 61.  The VE also testified that John B's past work on the assembly line corresponded to product assembler as well as hand packer, both unskilled, SVP level 3 positions, medium exertional level, but performed by John B. at the heavy level.  R. at 61.

The ALJ then asked the VE to assume the following hypothetical individual: an individual of the plaintiff's age, education and work background, who was limited to light work with no ladders, ropes, scaffolds, occasional stooping, kneeling, crouching, and crawling; who was

limited to simple, routine tasks, occasional interaction with the general public, no collaboration or teamwork; and no concentrated exposures to respiratory irritants.  R. at 61-62.  The VE testified that the individual could not perform John B's past work.  R. at 62.  Such individual could, however, perform the following unskilled occupations at the light exertion level: small products assembler or bench assembler, 200,000 jobs nationally; marker, 129,000 jobs nationally; or cafeteria attendant, 29,000 jobs nationally.  R. at 62.

The ALJ then asked the VE whether the hypothetical individual, if he needed "a sit, stand option" could still perform those occupations.  R. at 62.  In response, the VE testified that, with this additional limitation, the individual could not work as a marker and cafeteria attendant, and that he could work in bench assembly, with 150,000 jobs nationally.  R. at 63.  In addition, the hypothetical individual could work as a packager at a light level, 100,000 jobs nationally; or an inspector, 50,000 jobs nationally.  R. at 63.

The ALJ then asked the VE whether the hypothetical individual, if he needed a cane to ambulate, could still perform those occupations.  R. at 63.  The VE testified that use of a cane would eliminate the occupations of small products assembler, marker, and cafeteria attendant.  R. at 63.

For the next hypothetical, the ALJ asked the VE what jobs the individual, if limited to sedentary work, without a sit/stand option and without a cane, could perform.  R. at 63-64.  In response, the VE testified that, with this additional limitation, the hypothetical individual could work as a touch-up screener, with 8,000 jobs nationally; document preparer, with 19,000 jobs nationally; or a sedentary hand packer, with 10,000 jobs nationally.  R. at 64.  The VE further testified that each of those jobs could be performed if the individual required a sit/stand option and/or use of a cane to ambulate.  R. at 64.

The ALJ further inquired about acceptable percentages of off-task time and absenteeism. R. at 64.  In response, the VE testified that an individual off-task ten percent or more of the workday, or wholly absent more than once per month, or partially absent "a couple of times" per month would have difficulty maintaining employment as a touch-up screener, document preparer, or sedentary hand packer.  R. at 64-65.  In addition, the VE testified that none of those jobs offer the ability to lay down for any period of time.  R. at 66.  Upon questioning from the plaintiff's counsel regarding a "sit, stand, and then walk around" option, the VE testified that such a limitation would be perceived as off-task and would make it "difficult" to do the jobs.  R. at 67.

D.  The ALJ's Decision

The ALJ concluded that John B. had not been disabled since February 1, 2018, the asserted onset date in his application for benefits.  R. at 15, 26-27.  The ALJ followed the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520.  R. at 15-16.

At step one, whether the claimant was engaging in substantial gainful activity, the ALJ determined that John B. had not.  R. at 17.  Although the ALJ noted that John B. had earned $13,449.50 in 2018, "[i]t [wa]s unclear whether his earnings reached substantial gainful activity" and the plaintiff had not clarified them.  *Id.*  Nevertheless, the ALJ resolved the conflict in favor of the plaintiff and found that he had not engaged in substantial gainful activity since his alleged onset date of February 1, 2018.  *Id.*

At step two, whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe," the ALJ found that John B. had the following severe impairments: degenerative disc disease; degenerative joint disease of the left knee; asthma; obesity; and major depressive disorder with anxiety.  R. at 17 (citing 20 C.F.R. § 404.1520(c)).  The ALJ also noted that the record evinced several non-severe impairments,

11

including obstructive sleep apnea (OSA), anal fissure, hemorrhoids, and alcohol abuse.  R. at 17.
The ALJ asserted that she considered all of the listed impairments, including the non-severe
impairments, when assessing John B.'s residual functional capacity.  R. at 17.

At step three, whether the claimant has an impairment or combination of impairments that
meet or medically equal the severity of one of the listed impairments in 20 C.F.R. §§
404.1520(d), 404.1525, 404.1525, 404.1526, 416.920(d), 416.925 and 416.926, the ALJ found
that John B.'s impairments did not satisfy the criteria of any listed impairment.  R. at 17-19
(citing 20 C.F.R. at Part 404, Subpart P, Appendix 1).

Prior to step four, the ALJ determined that John B. retained the RFC to perform a reduced
range of light work.  R. at 19-20.  The ALJ determined that John B. could occasionally stoop,
kneel, crouch, and crawl, though he could not climb ladders, ropes, or scaffolds, nor be exposed
to respiratory irritants in concentrated amounts. R. at 19.  To account for John B.'s mental
limitations, the ALJ limited him to simple, routine tasks; occasional interaction with the public;
and no collaborative work or teamwork.  R. at 19-20.

The ALJ found that John B.'s impairments "could reasonably be expected to cause the
alleged symptoms" but discounted his testimony regarding the "intensity, persistence and limiting
effects" of his symptoms, concluding that his statements were "not entirely consistent with the
medical evidence and other evidence in the record."  R. at 20.  Although the ALJ agreed that the
plaintiff's impairments limit his overall level of functioning, she concluded that "the objective
medical evidence does not establish that these impairments are disabling."  R. at 20.

At step four, whether the claimant has the RFC to perform the requirements of his past
relevant work, the ALJ found that John B. could not perform his past relevant work.  R. at 24.

12

At step five, whether the claimant is able to do any other work considering his RFC, age, education, and work experience, the ALJ considered vocational expert testimony regarding a person of the plaintiff's age, education, work experience, and RFC, and found that there were jobs existing in significant numbers in the national economy that he could perform, including the unskilled, light jobs of small products assembler, marker, and cafeteria attendant.  R. at 25.  In the alternative, the ALJ considered vocational expert testimony regarding a person of John B.'s profile who could only perform sedentary work with the option to alternate between and sitting and standing and found that such a person could also perform the unskilled, sedentary jobs of packager and inspector.  R. at 26.  Based on the vocational expert testimony, the ALJ also found that such a person who also required a cane could perform the sedentary, unskilled jobs of inspector/touchup screener, document preparer, and hand packager.  R. at 26.

The ALJ formulated the following RFC description, limiting the plaintiff to:

> light work… except he is unable to climb ladders, ropes or scaffolds but he can perform occasional stooping, kneeling, crouching and crawling. There should be no concentrated exposures to respiratory irritants such as dusts, fumes, gases, etc. The claimant is able to perform simple routine tasks with occasional interaction with the general public but no collaborative or team work.

R. at 19-20.

Accordingly, the ALJ concluded that John B. was not disabled.  R. at 26-27.

## III.    Discussion

In his motion, John B. asserts that he is disabled and that the ALJ was incorrect in determining otherwise at step five.  The plaintiff principally argues that the ALJ erred: (1) in her evaluation of the medical evidence, which resulted in an unsupported weighing of medical opinions; and (2) in her residual functional capacity formulation and by not articulating a basis for the determination.  Pl.'s Mem. of Law, Doc. No. 14-1, at 7, 18.  The Commissioner responds

that the ALJ properly considered and weighed the medical evidence, and that the decision was supported by substantial evidence.  Def.'s Mem. of Law, Doc. No. 16-1.  I address the plaintiff's contentions below.

A.  <u>The ALJ did not commit reversible error in her evaluation of the medical evidence</u>

The plaintiff first argues that the ALJ erred in her evaluation of the medical evidence, misstating the record and cherry picking from it, which caused her to improperly find the state agency consultants' opinions persuasive, devalue the second opinion of treating physician Dr. Chelsea McIntosh, and (the plaintiff implies) discredit the plaintiff's subjective testimony.  Pl.'s Mem. of Law, Doc. No. 1-1, at 7-18.  The Commissioner contends that the plaintiff effectively asks the court to reweigh the evidence.  Def.'s Mem., Doc. No. 16-1, at 11-12.  I agree with the Commissioner that the ALJ's opinion is supported by substantial evidence.

1.  *The ALJ's opinion did not misstate the record and was supported by substantial evidence.*

John B. argues that the ALJ's opinion misstated the record concerning several of his ailments.  For this argument, John B. relies on *Horan v. Astrue*, in which the Second Circuit reversed an ALJ's decision after the ALJ inaccurately represented the plaintiff's own testimony about his abilities.  *See* 350 F. App'x 483, 484 (2d Cir. 2009).  There, the ALJ wrote that the plaintiff could dress himself, bring his child to and from school, prepare meals, and pull a blouse over his head.  *Id.* at 484.  However, the plaintiff had actually testified that he sometimes could not dress himself and that he sometimes required his child's assistance to get dressed, that he could not cook, and that he needed help bringing the child to school.  *Id.*  Said differently, the ALJ's decision in *Horan* entirely inaccurately represented the plaintiff's testimony.  By contrast,

the plaintiff here appears to dispute the ALJ's characterization of his symptoms and treatments rather than argue that the ALJ misstates the record. *Horan* is thus inapposite.

*First*, although John B. takes issue with the ALJ's characterization of his objective physical impairments as "mild" and treatments methods as "conservative," the ALJ's findings are consistent with the record and supported by substantial evidence.

Regarding the plaintiff's back pain, the ALJ observed that the objective medical records exhibited that John B. had "mild degenerative changes . . . and congenital stenosis," which had been treated with pain management, injection therapy, and physical therapy. R. at 21 (internal citations omitted). The ALJ cited medical records analyzing: (1) an August 1, 2019 X-ray of the plaintiff's lumbar spine, about which Dr. Harvey Hecht identified "[m]ild degenerative changes" (R. at 442, *repeated at* 1034), and (2) a November 25, 2019 magnetic resonance image, which revealed "mild canal stenosis and mild disc bulge" (R. at 2709, 2848), as noted by Dr. Howard Liu and APRN Garrett Matlick, and "[m]ild multilevel degenerative changes of the lumbar spine without evidence of severe central or foraminal stenosis," as observed by orthopedist Dr. Arya Varthi (R. at 845-46). The ALJ's use of the word "mild" to describe John B.'s back condition appears to have been taken straight from the objective medical evidence.[4]

Next, the plaintiff disputes the ALJ's characterization that his back pain was treated with "conservative" measures, contending that his lumbosacral spondylosis has been treated since January of 2019 with invasive measures, specifically injections, without benefit. *See* Pl.'s Mem., Doc. No. 14-1, at 7-8 (citing R. at 1494 (joint injections), 1496 and 2615 (facet injections), and

---

[4] Of note, although the Second Circuit has advised that an ALJ may not rely on medical opinions that use "the terms 'moderate' and 'mild,' without additional information" because such vague descriptions will not "permit the ALJ, a layperson notwithstanding her considerable and constant exposure to medical evidence, to make the necessary inference that [a plaintiff] can perform the exertional requirements" of work requiring a certain residual function capacity, *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000), the ALJ here appears to have merely reproduced evidence in the medical record.

2601 (trigger point injection)).  In addition to recognizing that the plaintiff's back pain had been treated with medication, physical therapy, and acupuncture, the ALJ acknowledged the plaintiff had been treated with injection therapy.  R. at 21.  Moreover, the ALJ's statement that the plaintiff was treated with "conservative treatment measures" is supported.  For example, this Court has endorsed an ALJ's characterization that a plaintiff's treatment for back pain was "conservative" where the treatment entailed physical therapy, medication, spinal injections, and "only one surgery."  *See Vitale v. Saul*, 2020 WL 1316641, *11 (D. Conn. Mar. 20, 2020).  Here, John B. was treated with physical therapy, medication, and injection therapy, and he was neither treated with nor recommended to undergo spinal surgery, indicating even less-invasive measures than the plaintiff in *Vitale*.  Indeed, in February of 2020, Dr. Varthi expressly declined to recommend surgery in light of the plaintiff's "young age" and "predominance of axial low back pain without radicular complaints."  R. at 846.

Regarding the plaintiff's knee pain, the ALJ acknowledged that John B. suffered from "tendinitis of the [left] patellar tendon" and noted that it had been treated with pain management and injections.  R. at 21 (citing R. at 1930-31 (documenting 2/20/2020 appointment treating knee pain with pain management and injection), 2559 (documenting 10/15/2018 appointment treating knee pain from patellar tendinitis with a nonsteroidal anti-inflammatory drug applied as a topical gel and stretching), 2590-91 (again documenting 2/20/2020 appointment treating knee pain with pain management and injection)).  There, too, the characterization of the condition as "mild" is taken from the record.  For example, the plaintiff himself cites to an MRI of his knee that orthopedist Dr. Edward Feliciano noted exhibited "mild grade I chondromalacia with mild inflammation," as well as "[m]ild para tendinosis of the proximal patellar tendon."  Pl.'s Mem., Doc. No. 14-1, at 8 (citing R. at 2145).

16

In other words, although the plaintiff points to cases in which courts have reversed an ALJ's decision based on testimony that the claimant did not give or an inconsistency with the record, the decisions on which John B. relies are distinguishable.  *See* Pl.'s Mem., Doc. No. 14-1, at 9 (citing *Tomlinson v. Astrue*, 2012 WL 346458, at *2 (E.D.N.Y. Feb. 2, 2012) (both plaintiff and defendant had agreed that the ALJ had made two factual errors in determining plaintiff's residual functional capacity)).  Instead, the ALJ's characterizations of the plaintiff's objective physical impairments appear to merely restate the objective evidence in the record.

*Second*, even though John B. disputes the ALJ's determination that "none of the medical records detail any significant loss of strength such that the claimant could not lift and or carry to the extent of the residual functional capacity," the ALJ's assessment of "largely normal physical examinations and minimal objective findings" is supported by substantial evidence.  Pl.'s Mem. of Law, Doc. No. 14-1, at 10.  The plaintiff lists various treatment notes documenting that he was moderately limited in his range of motion in all planes, producing local thoracic and/or lumbosacral pain, to argue that the record illustrates "greatly abnormal" examinations and "severe functional limitations."  *Id.* (citing R. at 276, 284-85, 322, 329, 331-32, 503-04, 509, 850, 895).  But I find no reversible error in the ALJ's analysis, which is supported by diagnostic evidence, treatment notes from the plaintiff's physicians, and the plaintiff's treatment history.

In articulating that the plaintiff had "largely normal physical evaluations" and "minimal objective findings," the ALJ specifically relied on treatment notes of APRN Matlick, dated 10/14/2109, noting normal range of motion of spine, though with some difficulty in bending and twisting on left side (R. at 650-51); treatment notes of orthopedist Dr. Varthi, dated 2/14/2020, noting five out of five strength on all strength tests (R. at 845); treatment notes of Dr. Gutierrez, dated 3/6/2020, also noting five out of five strength on all strength tests (R. at 849); treatment

notes of Dr. Feliciano, dated 10/15/2018, noting full knee range of motion and strength within normal limits (R. at 2559); treatment notes of Dr. Aris Barbadimos, dated 12/17/2019, noting "4+" out of five on all strength tests (R. at 2617-18); and treatment notes of Dr. Erik Berger, dated 12/30/2019, noting "motor strength normal" in upper and lower extremities (R. at 2622). *See also* R. at 626.[5]   In light of the foregoing, I cannot conclude that "no reasonable factfinder could have reached the ALJ's conclusions based on the evidence in record." *Lillis v. Colvin*, 2017 WL 784949, at *4 (D. Conn. Mar. 1, 2017) (citation omitted).

Moreover, as the Commissioner asserts, the Second Circuit has advised that "disability requires more than mere inability to work without pain" and that, to be disabling, "pain must be so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment." Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983); *see also Prince v. Astrue*, 490 F. App'x 399, 400 (2d Cir. 2013) (summary order) (quoting same). But "[u]nder the substantial evidence standard of review, it is not enough for Plaintiff to merely disagree with the ALJ's weighing of the evidence." *Lillis*, 2017 WL 784949, at *4 (cleaned up). Moreover, to the extent that the plaintiff contends that the ALJ "cherry picked" evidence, allegations of inappropriate cherry picking are "seldom successful because crediting [them] would require a court to re-weigh record evidence." *Glenn G. v. Kijakazi*, 2023 WL 2477501, at *8 (quoting *Lisa T. v. Kijakazi*, 2022 WL 2207613, at *3 (D. Conn. June 21, 2022)). Based on the facts in the record, I find no error in the ALJ's analysis warranting remand.

*Third*, John B.'s asserts— incorrectly— that the ALJ's determination that "[o]verall, the record shows the claimant has had largely within normal mental status examinations when he was actively treating" is a misstatement. Pl.'s Mem., Doc. No.14-1, at 15-16 (R. at 22). In support of

---

[5] The ALJ also cited two additional sources for which the support for her statement is less clear. R. at 21 (citing Exs. 27F/13 and 30F).

this argument, the plaintiff emphasizes his history of depression, suicidal ideation, medication overdose, and need for a medication lockbox and visiting nurse services to prevent him from carrying out a plan to overdose on his medications. *Id.* But I agree with the Commissioner that the ALJ considered John B.'s mental health conditions in light of treatment notes indicating the conditions were mostly controlled with medication management and therapy. Def.'s Mem., Doc. No. 16-1, at 7.

I begin by considering the Commissioner's suggestion that because the plaintiff's mental health symptoms were primarily connected to psychosocial stressors, they are not a basis for a finding of disability. Notes from treating psychologists Emily Calderone, Psy. D., and Chelsea McIntosh, Psy. D., do identify the plaintiff's principal care plan problem as "[d]epressive and anxious symptoms in reaction to environmental stressors." *E.g.*, R. at 278-79, 290, 304, 315, 343, 359, 364, 374, 384, 390, 398, 401, 404, 1093, 1096, 1099, 1102, 1109, 1112, 1115, 1122, 1125, 1128, 1135, 1138, 1141, 1144. But the Commissioner's argument misses the mark. The plaintiff's treatment notes document that the psychosocial stressors had an "aggravat[ing]" effect on his mental health, at times leading to extremely serious symptoms including but not limited to suicidal ideation and medication overdose. R. at 421 (note of Dr. McIntosh, dated 10/11/2018), 1308 (note of Dr. McIntosh, dated 1/31/2019). An ALJ's analysis should be directed to the stressors' disabling effects on the claimant and the functional limitations, if any, engendered by the stressors' disabling effects. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001).

That said, I ultimately agree with the Commissioner and the ALJ that the treatment notes support that that the plaintiff's mental impairments were mostly controlled with medication and therapy when the plaintiff was actively treating. The record documents that the plaintiff routinely had normal mental status examinations. *See* R. at 282, 290, 294, 298, 304, 307, 315, 319, 324,

19

335, 347, 353-54, 357, 368, 372, 378, 394-95, 424, 644, 871, 877, 890, 897, 900, 904, 908, 920, 943, 948, 954, 958, 962, 968, 970, 1097, 1100, 1103, 1106-07, 1116, 1119-20, 1125, 1132-33, 1138, 1144, 1148-49, 1164-65, 1184,8 1196, 1206, 1223, 1237, 2116.  APRN Jennifer Corridon, who oversaw the plaintiff's medication management, repeatedly noted from January to May of 2020 that the plaintiff's mood was "well controlled" with medication, even on occasions when she also noted that he endorsed significant life stressors.  R. at 1105, 1118, 1131, 1147, 1163, 1176, 3010-13.  Indeed, even when the plaintiff manifested the most extreme symptoms of his mental health conditions, the record indicates that his conditions returned to being well-managed soon after.  For example, the ALJ acknowledged the June 21, 2019 incident in which the plaintiff was brought to the hospital by police after reporting suicidal ideation to his therapist following a violent threat from his son.  R. at 22.  The treatment notes from that incident indicate that the plaintiff had "improved" and was cleared for discharge without admission that same day.  R. at 1342, 1348, 1788-91.  Less than one month later, the plaintiff reported that he was already feeling "back to normal," that his mood was "good," and that therapy and medication were "helpful."  R. at 3136-39.  Likewise, the ALJ acknowledged the May 31, 2020 incident in which the plaintiff was hospitalized for three days after overdosing medication.  R. at 22.  Treatment notes from less than one month later (June of 2020) indicated that the plaintiff's mood was again well-controlled with medication.  R. at 2931, 2944.  In sum, I am not persuaded by the plaintiff's contention that his mental impairments were more debilitating than the ALJ assessed.  Instead, I conclude that the ALJ's assessment was supported by substantial evidence.

2. *The ALJ did not err in her evaluation of the medical opinions.*

The plaintiff also challenges the ALJ's reliance on the state agency opinions and argues that the ALJ should not have discounted the less restrictive portions of Dr. McIntosh's opinions. Pl.'s Mem. of Law, Doc. No. 14-1, at 16-18 (citing R. at 23). I am not persuaded.

Under the new regulations, the ALJ focuses on the persuasiveness of medical opinions and prior administrative medical findings using five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors. 20 C.F.R. § 404.1520c(a)–(c). Supportability and consistency are the two most important factors in determining the persuasiveness of a medical opinion or prior administrative finding. 20 C.F.R. § 404.1520c(b)(2).

*First,* the ALJ found that the state agency opinions endorsing "unskilled, light work with postural and environmental restrictions" were "persuasive," because their findings were "consistent with the objective medical evidence showing only mild diagnostic findings with no recommendation for surgical intervention." R. at 23. John B. argues that the ALJ should not have relied on the "very limited" state agency opinions because they were based on "an undeveloped record" largely missing John B.'s records of orthopedic impairments. Pl.'s Mem. of Law, Doc. No. 14-1, at 16-18. The Commissioner disputed this contention on the basis the ALJ ultimately "reviewed the entire record, including treatment notes that the consultants did not review." Def.'s Mem., Doc. No. 16-1, at 16. I agree with the Commissioner.

"'State agency physicians are qualified as experts in the evaluation of medical issues in disability claims. As such their opinions may constitute substantial evidence if they are consistent with the record as a whole.'" *Murillo v. Saul*, 2020 WL 1502194, at *7 (D. Conn. Mar. 30, 2020) (quoting *Babcock v. Barnhart*, 412 F. Supp. 2d 274, 280 (W.D.N.Y. 2006)

(additional citations omitted)).  Here, as I have already explained, the ALJ's assessment that the objective medical evidence showed only mild diagnostic findings, no recommendation for surgical intervention, and that his mental impairments were well-controlled when actively treated was supported by substantial evidence.  Therefore, I cannot find error in her evaluation of the state agency consultants' assessments as consistent with the record.

*Second*, the ALJ found Dr. Chelsea McIntosh's second opinion "less persuasive, as the assessed findings for worsening conditions [we]re not identified in the treatment notes."  R. at 23. John B. asserts without elaboration that "[t]he ALJ had no reason for determining that the less restrictive portion of Dr. McIntosh's opinion is persuasive, while the more restrictive portion is not persuasive."  Pl.'s Mem., Doc. No. 14-1, at 18.  I disagree.

By way of background, Dr. McIntosh completed the first questionnaire in October 2019 ("First Questionnaire"). R. at 458-62.  Therein, Dr. McIntosh concluded that John B. had average, better than average, or excellent ability in all areas of functioning, including in the five categories describing activities of daily living, four categories of social functioning, and six categories of task performance. R. at 460-61.  She deemed him fully oriented and well-groomed with appropriate hygiene and clothing. R. at 459.  Although his memory was intact, he had difficulty focusing.  R. at 459.  She also noted normal speech, that he endorsed hearing voices, impaired insight, and minimally impaired judgment. R. at 459.  The plaintiff principally complained of anxiety and depression related to psychosocial stressors.  R. at 459.

The ALJ deemed the First Questionnaire and its assessment of average to excellent functioning persuasive because the information therein was aligned with the plaintiff's generally normal mental status examinations, when he was compliant with treatment. R. at 23.  Although the ALJ acknowledged Dr. McIntosh's recording of the plaintiff's subjective complaints, the ALJ

discredited the plaintiff's subjective complaints as less persuasive because they were not based on any objective findings.  R. at 23.  For instance, Dr. McIntosh noted that the plaintiff reported difficulty dressing due to back pain, coping, controlling anger, maintaining relationships, and comprehending.  R. at 460-61.

Dr. McIntosh completed the second questionnaire in December 2019 ("Second Questionnaire").  The second questionnaire noted worsening conditions in task performance and activities of daily living but improved social functioning.  R. at 2655-59.  It identified that the plaintiff had "limited ability" to use coping skills and handle frustration and "reduced ability" in all six areas of task completion, including carrying out one-step instructions, focusing long enough to complete simple activities, and persisting in simple activities.  R. at 2657-58.

The ALJ deemed the Second Questionnaire less persuasive, concluding that the written responses in the Second Questionnaire appeared to be the claimant's subjective complaints and thus less persuasive.  R. at 23.  As already set forth, the ALJ's determination that the plaintiff's mental impairments were mostly controlled with medication and therapy when the plaintiff was actively treating was well-supported.  Because the findings in the Second Questionnaire were not reflected in the treatment notes, the ALJ reasonably concluded that the Second Questionnaire was less persuasive than the First Questionnaire.  "The fact that [plaintiff] does not agree with [the ALJ's] findings, does not show that the ALJ failed to comply with the applicable standards." *Lena v. Astrue*, 2012 WL 171305, at *12 (D. Conn. Jan. 20, 2012).  Instead, I must uphold an ALJ's decision where substantial evidence supports the ALJ's findings.

3. *The plaintiff's additional arguments are unavailing.*

The plaintiff presents several additional arguments, none of which persuades me that reversal and/or remand would be appropriate.

23

*One*, observing that treatment notes indicated that John B. had been counseled on the importance of daily exercise, the ALJ noted that "no medical findings . . . show the claimant's limitations[] preclude the performance of work within the light residual functional capacity."  R at 21-22.  John B. argues that that "the record is clear that [he] was not able to perform strenuous exercise or anything resembling light exertion."  Pl.'s Mem., Doc. No. 14-1, at 13 (citing R. at 287, 301, 309, 329, 502-03, 845-49, 1493).  The Commissioner counters that "[t]he fact that Plaintiff's provider continuously suggested regular exercise suggests that he did not believe Plaintiff's back pain would prevent him from doing so, which undercuts his claim of disabling physical impairments."  Def.'s Mem., Doc. No. 16-1, at 12.

I may not decide facts, reweigh evidence, or substitute my judgment for that of the Commissioner.  *Rogers v. Saul*, 2020 WL 2719515, at *9 (D. Conn. May 26, 2020) (citing *Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted)).  Rather, I must assess the medical record to determine the reasonableness of the ALJ's factual findings.  Here, the ALJ identified the recommendation to exercise in the record.  R. at 853, 884, 891, 898, 901, 904, 910, 921, 943, 948, 954, 962, 977.  "In the absence of other evidence in the record," the ALJ could reasonably conclude that "a physician's unrestricted recommendations to increase physical exercise are inconsistent with a claim of physical limitations."  *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013) (citing *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)).  On this record, it was not unreasonable for the ALJ to find that the plaintiff's physicians' repeated recommendations for daily exercise were inconsistent with John B.'s contention that he was incapable of work entailing light exertion.

*Two*, John B. argues that the ALJ failed to make meaningful findings regarding the combination and interaction of his impairments, especially his weight, sleep apnea, knee and back

24

conditions, depression, and medication effects.  Pl.'s Mem., Doc. No. 14-1, at 13-15, 21-23.  The Commissioner counters that the ALJ in fact considered the combined effect of John B.'s obesity and other impairments, as well as the effects of pain on John B.'s concentration.  Def.'s Mem., Doc. No. 16-1, at 12 (citing R. at 19, 22).

The ALJ must evaluate the combined impact of impairments on a claimant's ability to work.  *See* 20 C.F.R. §§ 404.1523(c), 416.923(c) ("If we do find a medically severe combination of impairments, we will consider the combined impact of the impairments throughout the disability determination process.").  The ALJ must also consider the combined effects of non-severe impairments.  *Felshina v. Schweiker*, 707 F.2d 71, 73-74 (2d. Cir. 1983).  In addition, an ALJ "must evaluate [the physical and mental impairments'] combined impact on a claimant's ability to work, regardless of whether every impairment is severe."  *McIntyre v. Colvin*, 758 F.3d 146, 151-52 (2d Cir. 2014) (internal quotation marks and citation omitted).

The ALJ's decision demonstrates that she was aware of and considered the combination of the plaintiff's impairments.  At step two, the ALJ found that John B. suffered from severe physical and mental impairments: degenerative disc disease; degenerative joint disease of the left knee; asthma; obesity; and major depressive disorder with anxiety.  The ALJ additionally noted the objective medical evidence concerning the plaintiff's non-severe impairments— specifically John B.'s obstructive sleep apnea, anal fissure, hemorrhoids and alcohol abuse— which she assessed "establish[ed] only a slight abnormality or a combination of slight abnormalities that have no more than a minimal effect on the [plaintiff's] ability to meet the basic demands of work activity."  R. at 17 (citing 20 CFR 404.1522, and Social Security Rulings (SSRs) 85-28, 96-3p, and 96-4p)) (emphasis added).  At step three, the ALJ asserted (though in a somewhat conclusory fashion) that she had considered the "potential impact of [the plaintiff's obesity in causing or

contributing to co-existing impairments." R. at 18. The ALJ also asserted that she considered the plaintiff's mental impairments "singly and in combination" and determined that they did not meet or medically equal the criteria of Listings 12.04 (for depressive, bipolar and related disorders) and 12.06 (for anxiety and obsessive-compulsive disorders). R. at 18. Finally, when making her RFC finding at step four, the ALJ claimed that she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p." R. at 20. In other words, the ALJ found the plaintiff's obstructive sleep apnea, anal fissure, hemorrhoids and alcohol abuse to be non-severe impairments; explicitly considered how they affected the plaintiff; and factored them into her RFC finding. R. at 18. "An ALJ does not have to state on the record every reason justifying a decision. Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (internal citation and quotation marks omitted). Here, it is clear the ALJ considered the plaintiff's impairments, and those impairments in combination, "throughout the disability determination process." *Burgin v. Astrue*, 348 F. App'x 646, 647 (2d Cir. 2009) (summary order). Taken together, then, the plaintiff's argument appears more to evince disagreement with the ALJ's assessment of and weighing of the evidence concerning his impairments rather than identify an error causing the plaintiff harm.

Moreover, after thoroughly examining the evidence of the plaintiff's relevant limitations and restrictions, the ALJ concluded that his impairments did not preclude him from light work, subject to modifications. In doing so, the ALJ incorporated modifications above and beyond the recommendations of the state agency consultants; specifically, she incorporated environmental restrictions to account for the plaintiff's respiratory limitations. R. at 19. Accordingly, I find that

the ALJ properly considered the impairments in combination with the plaintiff's other impairments, and substantial evidence supports the ALJ's finding that they did not limit him beyond a light RFC. *See Seekins v. Astrue*, 2012 WL 4471266, at *7 (D. Conn. Aug. 14, 2012), *report and recommendation adopte*d, 2012 WL 4471264 (Sept. 27, 2012) (finding no error where "the ALJ plainly recognized the plaintiff's allegations of a 'combination of exertional and nonexertional limitations' and considered them together in determining Plaintiff's RFC[]'").

Accordingly, remand on these bases is not warranted.

B. Substantial evidence supports the RFC assessment.

The ALJ denied the plaintiff's claim for disability insurance benefits after determining at Step Five that he had the RFC to "perform light work . . . except he is unable to climb ladders, ropes or scaffolds but he can perform occasional stooping, kneeling, crouching and crawling"; that "[t]here should be no concentrated exposures to respiratory irritants such as dusts, fumes, gases, etc."; and that the plaintiff could "perform simple routine tasks with occasional interaction with the general public but no collaborative or team work." R. at 19-20. The plaintiff argues that the ALJ formulated an RFC description that is not reflective of his actual impairments and insufficiently articulated her basis for the finding. Pl.'s Mem., Doc. No. 14-1, at 18-20. The Commissioner counters that the ALJ accounted for John B.'s limitations that were supported by the record as a whole and properly formulated the RFC based on the evidence in the record. Def.'s Mem., Doc. No. 16-1, at 4-14. I conclude that substantial evidence—treatment notes and the objective medical evidence, Dr. McIntosh's opinions, and the opinions of the state agency examiners— supports the ALJ's RFC assessment.

The RFC is an "assessment of 'the most [the disability claimant] can still do despite [his or her] limitations.'" *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013)

(summary order) (quoting 20 C.F.R. § 404.1545(a)(1)).  An RFC is assessed using "all the

relevant evidence in [the] case record."  20 C.F.R. § 404.1545(a)(1).  "On appeal, the question is

not whether there was substantial evidence for disability; it is whether the ALJ's finding of no

disability had substantial evidentiary support. This means that '[i]f the reviewing court finds

substantial evidence to support the Commissioner's final decision, that decision must be upheld,

even if substantial evidence supporting the claimant's position also exists.'"  *Lori A. K. v.

Comm'r of Soc. Sec.*, 2023 WL 2607637, at *10 (D. Conn. Mar. 23, 2023) (quoting *Johnson v.

Astrue*, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008); *see generally Alston v. Sullivan*, 904 F.2d

122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the

determination is one to be made by the factfinder.") (citation omitted)).

     *First,* although the plaintiff appears to seek a more restrictive exertional finding than that

he has the RFC to perform light work, the treatment notes are consistent with that level of

functioning.  The record does not suggest that the ALJ should have imposed additional exertional

limitations.

     The ALJ considered the plaintiff's reports of pain throughout her decision, in addition to

the plaintiff's testimony that he had to spend significant portions of the day laying down to

manage his pain.  *See* R. at 19 ("[The plaintiff] testified that his pain also affects his focus and

concentration."); R. at 20 ("The [plaintiff] testified that he was unable to work primarily due to

back pain. . . ."); R. at 21 ("The medical evidence of record shows the claimant with a history of

back pain complaints."); R. at 22 ("[H]e took medication prescribed for pain. . . .").  Further, the

ALJ considered the effects of the plaintiff's anal fistula, noting that the conditions were

"managed medically" as a result of surgery and amenable to proper control by adherence to

recommended treatment methods, including adding fiber to his diet and a bowel regimen.  R. at

17.  Thus, notwithstanding that the ALJ ultimately did not find the plaintiff's descriptions of the intensity, persistence, and limiting effects of his pain to be consistent with the record, she did appear to substantially credit his reports of pain, articulating a RFC formulation accounting for the fact that his impairments (including but not limited to pain) "limit his overall level of functioning," cause "physical limitations," and necessitate "postural and environmental restrictions."  R. at 20-21.

     But, as already set forth, the diagnostic evidence demonstrated that the plaintiff had only mild degenerative changes and congenital stenosis in his lumbar spine, and mild para tendinosis of the proximal patellar tendon, R. at 846, 2145; did not detail any significant loss of strength, *see* R. at 650-51, 845, 849, 2559, 2617-18, 2622; nor reveal that the plaintiff had significant problems ambulating.  Although the ALJ considered John B.'s testimony that he had been using a cane for three years due to back pain, treatment notes indicated that the plaintiff had only once used a cane at a mental health visit (R. at 2333), and the remainder of the medical records— especially persuasively, the documentation of his various orthopedic visits— did not substantiate cane use. R. at 21 (citing R. at 42).  Instead, the ALJ's assessment of normal gait and strength, R. at 21, was well-supported.  *See* R. at 294, 324, 334, 347, 357, 388, 412, 417, 428, 651, 1331, 1348, 1370, 1387, 1698, 2578, 2640, 2643, 2646, 2690, 2694 (all indicating gait was "normal" or "steady").  In addition, treatment notes do not reflect that the limitations to the plaintiff's range of motion in his lumbar spine were more severe than the ALJ accounted for, even if the treatment notes indicated some findings of tenderness and reduced range of motion requiring some postural limitations.

     The ALJ's physical RFC assessment is also supported by the opinions of the state agency physicians.  The ALJ's physical RFC finding drew some support from the prior administrative

medical findings of the state agency medical consultants, Drs. Beazley and Foster.   The
consultants concluded that the plaintiff could perform the exertional requirements of medium
work with occasional stooping, kneeling, crouching, and crawling and no climbing ladders, ropes,
and scaffolds.  R. at 77-79, 91-93.  In addition to considering the medical evidence, the
consultants noted that the plaintiff's activities of daily living were "not greatly limiting," noting
that he completed personal care tasks, cooked, cleaned, did laundry, and shopped— findings that
are supported by the plaintiff's testimony and the record.  R. at 54, 79, 92-93, 209-11.

The ALJ additionally found the state agency medical consultants' assessment persuasive
because it was consistent with the objective medical evidence showing only mild diagnostic
findings with no recommendation for surgical intervention.  R. at 23.  Nonetheless, the ALJ
imposed a more restrictive RFC by limiting the plaintiff to light work and by incorporating
environmental restrictions to account for the plaintiff's respiratory limitations.  R. at 19.

*Second*, with respect to the plaintiff's mental limitations, the ALJ's mental and social
RFC was supported by substantial evidence including: (1) the plaintiff's numerous normal mental
status examinations, *see supra*; (2) the medical opinions, *see supra*; and (3) the psychiatric review
technique categories.

The ALJ considered the plaintiff's testimony that he had difficulty focusing and
concentrating due to mental limitations and pain.  R. at 19, 53.  However, as already set forth, his
mental status examinations routinely showed intact attention, concentration, and memory.

The ALJ also considered the opinions of the plaintiff's treating physician and state agency
consultants.  The ALJ considered the two opinions of Dr. McIntosh, weighing more heavily Dr.
McIntosh's first opinion assessing average to excellent functioning in all areas.  *See* R. at 23, 458-
62, 2655-59.  The ALJ's opinion was also supported by the opinion of state agency consultant Dr.

Thomas Hill, who concluded on reconsideration that John B. was moderately limited in carrying

out detailed instructions; maintaining attention and concentration for extended periods; working

in coordination with or in proximity to others without being distracted by them; completing a day

and week without interruptions from symptoms and performing at a consistent pace; interacting

appropriately with the public; and setting realistic goals and making plans independently.  R. at

93-95.  Dr. Hill explained that the plaintiff could perform routine, repetitive tasks and carry out

simple instructions, and he could maintain attention and concentration at least two hours at a

time.  R. at 90, 94.  Dr. Hill also noted that although the plaintiff became anxious in certain

settings, he could still function and relate with staff.  R. at 94.

Additionally, the ALJ employed the PRT categories.  The PRT rates an individual's

degree of mental limitation in four functional areas: (1) understanding, remembering, or applying

information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and

(4) adapting or managing oneself.  *See* 20 C.F.R. § 404.1520a(c)(4).  The PRT is used by the ALJ

to evaluate the functional limitations stemming from a claimant's mental impairments.  20 C.F.R.

§ 404.1520a(e)(2).  Here, the ALJ noted that the plaintiff could explain his medical history to

medical providers (R. at 18); that the plaintiff had worked as a taxicab dispatcher while he was

allegedly disabled, earning more than $13,000 (R. at 24, 58, 190); that the plaintiff was

cooperative during treatment without any behavioral issues; that the plaintiff cared for his own

personal needs including maintaining personal hygiene, grooming, and appropriate dress (R. at

209-10, 2117) and cooked meals for himself and his wife (R. at 20, 49, 210).

In sum, the ALJ's mental RFC— which limited him to simple, routine tasks with

occasional interaction with the public and no collaborative work or teamwork— was supported

by substantial evidence.  R. at 19-20.

This Court will "set aside the ALJ's decision only where it is based upon legal error or is not supported by substantial evidence." *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). Taken together, the ALJ accounted for the plaintiff's physical limitations in the RFC by reasonably concluding that he was limited to light work with additional limitations. The treatment notes and other evidence do not support more significant restrictions including, as the plaintiff suggests, a finding that he is disabled within the meaning of the Social Security Act.

    *The plaintiff's additional arguments are unavailing.*

One, the plaintiff contends that his ability to perform light or sedentary work is "not really the relevant factor that determines his disability"; rather, the determinative factor is "off-task behavior . . . caused both by his symptoms and his medication side-effects." Pl.'s Mem., Doc. No. 14-1, at 19-25. He emphasizes the combination and interaction of his symptoms and medication side-effects, arguing that he cannot perform the standing and walking requirements of light work nor the sitting requirements of sedentary work, and that his need to lie down to manage back pain and his loss of focus due to depression lead to work-preclusive off-task behavior. *Id.* at 19-26 (quoting R. at 64 (quoting the Vocational Expert for the proposition that "if an individual if off-task 10% or more during the workday, he's going to have a difficult time keeping up the job and ultimately holding on to the job")). The Commissioner counters that the plaintiff falls short of satisfying his burden to provide evidence to support the more restrictive RFC for which he is advocating. Def.'s Mem., Doc. No. 16-1, at 13. I agree.

The ALJ, based on the testimony of the vocational expert, identified two jobs that the plaintiff could perform even if he were limited to sedentary work with the option to alternate between sitting and standing, as well as three additional jobs the plaintiff could perform if he required a cane. R. at 26. Therefore, I agree with the Commissioner that even accounting for

32

those additional limitations, John B. would not be disabled within the meaning of the Social Security Act.  R. at 26.

Two, the plaintiff argues that remand is warranted because the ALJ failed provide a narrative or failed to provide an accurate narrative linking her RFC assessment to the record. Pl.'s Mem., Doc. No. 14-1, at 24-25.  But an ALJ is not required to list each limitation of the RFC followed by the specific evidence that supports it.  *See generally* SSR 96-8p; *see also Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013) (holding that the ALJ's failure to explicitly engage in a function-by-function, RFC analysis does not require remand where the ALJ's analysis provides a basis for meaningful review, applies the correct legal standards, and is supported by substantial evidence).

Accordingly, I cannot conclude that remand on these bases is warranted.

## IV.    Conclusion

For the foregoing reasons, I **deny** the plaintiff's Motion to Reverse the Decision of the Commissioner (doc. no. 14), and I **grant** the defendant's Motion to Affirm (doc. no. 16).

The decision of the Commissioner is **affirmed**, and the Clerk is directed to close this file.

So ordered.

Dated at Bridgeport, Connecticut, this 25th day of September 2023.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge